Herbert Drefahl and Martin Stefecek, Appellees, v. William Hinchcliff, Jr., Trading as Hinchcliff Motor Service, and Robert Armey, Appellants.

Gen. No. 41,412.

Opinion filed April 23, 1941.

Lord, Bissell & Kadyk, of Chicago, for appellants;
C. H. G. Heinfelden and Russell Greenacre, both of
Chicago, of counsel.

Henry Mitgang, of Chicago, for appellees; Arthur
A. Wolfinsohn, of Chicago, of counsel.

Mr. Justice Burke delivered the opinion of the
court.

On November 13, 1939, plaintiffs filed their amended
complaint in the superior court of Cook county to re-
cover damages for injuries to the person and the auto-
mobile of each of the plaintiffs respectively. The in-
juries arose out of an accident which involved an
Essex automobile driven by the plaintiff Martin Stefe-
cek, a Plymouth automobile driven by the plaintiff
Herbert Drefahl and an auto truck driven by the de-
fendant Robert Armey. The accident occurred on
July 28, 1938, in the city of Chicago. In driving the
truck, Armey was a servant of the defendant William
Hinchcliff, Jr. The amended complaint alleges due
care on the part of each plaintiff and negligence on the
part of Armey. It also alleges that Armey "wilfully,
wantonly and maliciously drove said auto truck" at
"a reckless rate of speed." After a trial the jury re-
turned a verdict finding both defendants guilty and
assessing Drefahl's damages at $2,500 and Stefecek's
damages at $750. Judgment was entered upon the
verdict. At the close of plaintiffs' case and again at

the close of all of the evidence, motions presented by the defendants for a directed verdict were overruled. After the return of the verdict, the defendants moved for a judgment notwithstanding the verdict and also for a new trial, which motions were overruled. This appeal is prosecuted to review the judgment. Plaintiffs' theory of the case (as stated in defendant's brief) is that "Stefecek was driving his automobile southwesterly upon Archer Avenue; that Drefahl was driving a short distance behind Stefecek; that Stefecek, because of trouble with his automobile, stopped it or was unable to prevent it from stopping; that Drefahl stopped his automobile behind Stefecek's automobile; that after said two automobiles had been stopped for a substantial period of time, the auto truck driven by Armey came up at an excessive speed and crashed into the rear of Drefahl's automboile, causing it to strike Stefecek's automobile; and that as a result Stefecek and Drefahl each sustained personal injuries and injuries to his automobile. It is impossible for defendants to know whether plaintiffs base their claims upon Armey's alleged negligence and plaintiffs' alleged freedom from contributory negligence, or whether plaintiffs base their claims upon the alleged wanton and wilful misconduct of Armey." Defendants' theory of the case is that "in view of the allegations of the complaint, and the proceedings upon the trial, the verdict and judgment cannot be sustained unless Armey was guilty of wanton and wilful misconduct; that the auto truck driven by Armey was following the plaintiffs' two automobiles at a reasonable speed under the circumstances; that said two automobiles slowed down at the intersection of Archer Avenue and Mason Avenue, indicating that they might turn or stop, and then proceeded so as to indicate that they would continue at least to the next intersecting street, but suddenly stopped a short distance beyond the intersection of Archer Avenue and Mason Avenue; that

the stopping of said two automobiles was done under such circumstances as to constitute negligent conduct by each plaintiff; and that in any event the failure of Armey to avoid striking Drefahl's automobile with the auto truck was due neither to negligence on his part, nor to any wanton and wilful misconduct."

Defendants advance two points, first that "the verdict must be presumed to be based upon the alleged wanton and wilful misconduct of Robert Armey, and there being no evidence to support a finding that he was guilty of wanton and wilful misconduct, the verdict and judgment should be set aside"; and second that "the trial court should have allowed defendants' motion for a new trial because the verdict is against the manifest weight of the evidence." In support of their first point defendants lean heavily on the case of *Greene v. Noonan,* 372 Ill. 286, 291:

"Counsel for the appellee say that even though the court erred in refusing to instruct as to the wilful and wanton charge, the rule in this State is that if there is one good count in a declaration it is enough to sustain a verdict and judgment, and that this applies to cases where the declaration contains counts that are not supported by evidence. However, there is also a rule in this State, pertaining to wilful and wanton counts in a declaration, which is controlling in the situation here. That rule is that where the declaration consists of several counts, one or more of which state a cause of action the gist of which is malice, with others based upon negligence only, and the verdict is general, without specifying the count on which it is based, the presumption is that the verdict is based upon a cause of action of which malice is the gist. . . . A defendant in a case of this character, facing a charge of wilful and wanton conduct, is placed at a serious disadvantage as compared with one charged merely with negligence, and where there is no evidence to support such charge, it is the court's duty, on mo-

tion, to withdraw such charge from the jury, and failure so to do is, by reason of the character of the charge, error requiring reversal of judgment, for no one may know what influence the charge, though not proved, may have had upon the jury, particularly since it has not been informed that it was not to be considered by it. The distinction in law between wilful and wanton conduct and mere negligence is not a matter with which the average juror is familiar. We are of the opinion that the refusal to withdraw from the jury on appellants' motion, the consideration of the wilful and wanton charges, requires a retrial of the cause.'' The statement made by defendants as to the law is not seriously challenged by plaintiffs. The latter, however, reply that whether an act is wilful or wanton depends upon the circumstances in each case, that there is ample evidence tending to show that the conduct of Armey was wilful or wanton, and that a question of fact was presented to the jury as to whether such conduct amounted to wantonness. Answering defendants' point that their motion for a new trial on the basis that the verdict is against the manifest weight of the evidence, should have been allowed, plaintiffs say that the verdict is in accordance with the manifest weight of the evidence, and that the court did not err in refusing to grant a new trial. We have read the transcript in order to determine whether there is competent evidence to warrant the jury in finding that Robert Armey was guilty of wilful and wanton misconduct and also to determine whether the court erred in declining to allow the motion for a new trial. Archer avenue runs southwest and northeast. Mason avenue, a north and south highway, runs into Archer avenue from the north. Paul Hurbanis was a passenger in Stefecek's Essex automobile, and Fred Donath was operating a steam roller in a southwesterly direction on Archer avenue. Stefecek testified that he was operating the Essex automobile at

about 20 minutes before 8 a. m. on July 28, 1938, in a southwesterly direction on Archer avenue; that just before coming to Mason avenue his speed was about 25 miles an hour; that he intended to turn to his right into Mason avenue and slowed down to 12 or 13 miles an hour by putting on his brakes; that putting on his brakes lighted a red taillight on his automobile; that he could not make the turn which he intended to because he saw a "horse" blocking Mason avenue and because work was being done by the "WPA"; that when he was half way across Mason avenue the motor "started to stopping"; that he proceeded to operate the starter and came to a stop about 15 or 20 feet west of Mason avenue; that when he stopped a telegraph pole on the north side of Archer avenue was in front of him; that he was completely stopped and had been for about three quarters of a minute when his automobile was struck in the rear by another automobile; that before coming to Mason avenue he saw an automobile behind him at a distance of more than 100 feet; that such automobile must have been the other automobile involved in the accident because no other car passed him; that he put on his brakes and that he gave no signal after he crossed Mason avenue. Paul Hurbanis testified that he was riding with Stefecek; that he and Stefecek intended to go to Soukal's, a florist, and for that purpose were going to turn to the north (right) on Mason avenue; that just before coming to Mason avenue their speed was about 10 to 13 miles an hour, but before that it was about 26 miles per hour; that they proceeded to go about 17 feet west of the west curb line of Mason avenue, stopped for about three quarters of a minute and then there was a crash; that there was a telegraph pole on the north side of Archer avenue about 30 feet west of the west curb line of Mason avenue and about 25 feet west of where they stopped; that the car in which they were riding was pushed into the prairie and that the car was against

the sign post which was knocked down by the impact. A photograph in evidence shows that Archer avenue is a broad well-paved highway and that no street car tracks are laid thereon in the vicinity of the scene of the collision. This photograph shows a cement sidewalk on the north side of Archer avenue, extending in a southwesterly direction from Mason avenue. The street is paved with cement or concrete. Between the cement pavement and the sidewalk is a strip commonly called a parkway. The telegraph post mentioned in the testimony is erected in the parkway, slightly east of the cement sidewalk. Another photograph of the scene of the accident was taken from a different direction than the first photograph. The photographs show a considerable area of vacant land to the north of the sidewalk. This vacant land appears to be on a level with the sidewalk. On this vacant land stood a wooden sign supported by two upright posts reading, "Soukal Floral Co., Flowers for All Occasions." This is the sign which was knocked down by the Stefecek car. Drefahl, called by plaintiffs, testified that on July 28, 1938, he owned and was operating a Plymouth automobile in a southwesterly direction on Archer avenue; that the highway was dry and it was a clear day; that he was driving in the north traffic lane and as he approached Mason avenue he noticed that there was a car ahead of him and also a road roller and that he then slowed down to a speed of 20 to 25 miles an hour; that he saw the taillights on the car in front of him flash when he was about 100 feet or better behind him; that the other car slowed down to a speed of 7 or 8 miles per hour, which necessitated his (Drefahl's) slowing down again; that he applied his brakes when the car ahead of him slowed down; that he believed he gave no signal with his hand when slowing down, but kept both hands on the wheel; that he passed the road roller on its right, the roller being in the traffic lane near the center of the road; that the car ahead of him

stopped about 15 or 20 feet past the west curb of Mason avenue, and that he (Drefahl) stopped his automobile about 6 or 8 feet behind that car; that before the other car stopped the driver of that car appeared to be having trouble because he slowed down so much and his car had a tendency to jerk; that upon stopping behind the car ahead of him he blew his horn and in the meantime the road roller was coming alongside of him; that he flashed his automobile brake lights on and off two or three times in coming to a stop; that while he was stopped he again applied his brakes flashing the lights on his stop signals; that while he was standing he looked in his rear view mirror and noticed a truck bearing down on him about 35 or 50 feet, or a little more, coming up behind his car but he could not "jump" to the left because of the roller, nor turn to the right because of the telegraph pole; and that the truck hit his automobile, the impact knocking him unconscious. Drefahl further testified that his automobile stood behind the other car before the truck crashed into his automobile; that the road roller was just passing him as the truck struck him; that when he first saw the road roller its speed was about 5 miles per hour, but that he did not know whether it continued at the same speed. He identified the place of the accident as right opposite a water hole on the northwesterly side of Archer avenue, west of Mason avenue, but east of the telegraph pole nearest to it. Donath testified that on July 28, 1938, he was working in the vicinity of Archer avenue and Mason avenue; that he was operating a road roller along Archer avenue; that he was east of Mason avenue, and that he was going to Austin avenue; which is west of Mason avenue; that the Essex (Stefecek's automobile) was going about 15 or 20 miles per hour and then slowed down; that the Essex was "just about stopped" when the Plymouth (Drefahl's automobile) "stopped" in back of it; that when the accident occurred the Essex was about 25

feet west of Mason avenue and there was about 10 feet between the Essex and the Plymouth; that he did not see the truck before the collision took place, but saw it as it "just passed" his roller, his roller being about 75 feet east of Mason avenue; that he saw "these two machines" passing him and looked, and as he looked he saw the truck coming; that he was about 75 feet east of Mason avenue; that he was east of the accident and that the accident occurred "maybe" 35 or 40 feet in front of him; that in his opinion the truck was going at a speed of "at least 45 to 50 to 55 miles an hour"; that the truck was going 40, 45 or 50 miles per hour, and that shortly before the accident the speed of the roller was from 4 to 5 miles per hour; that the collision knocked the machine off the street; that he could form an opinion on how fast a vehicle is moving; that he saw the truck move a distance of 100 feet before the collision, and that he did not see the truck slow up at all before the collision. Robert Armey, called by defendants, testified that on July 28, 1938, at about 7:50 a. m., he was driving a truck southwest on Archer avenue in the traffic lane next to the curb; that as he approached Mason avenue there were two automobiles and a steam roller in front of him; that before he reached Mason avenue he was going between 25 and 28 miles per hour, and that as he approached Mason avenue he was about 75 feet behind the Essex automobile, which was going about the same speed as his (Armey's) truck; that the first automobile started to slow down and the second automobile also slowed down so that he (Armey) had to shift gears and he slowed down to about 15 miles per hour; that the first car "stopped like he was going on" and he (Armey) left his truck "in gear" and both automobiles stopped in front of him, and that "it was too close to stop then"; that when the automobiles stopped they were between the steam roller and the curb, and that the speed of the steam roller was about 4 or 5

miles per hour; that his speed as he drove along Archer avenue was about 25 to 28 miles per hour and not any greater at any time; that he was about 75 feet behind the Plymouth automobile when he saw the two automobiles start to slow down and was following about that close; that he could stop the truck in about 35 or 40 feet; that he saw no stop light on the Plymouth but could and did see that it was slowing down; that the Plymouth and his truck slowed down to about the same speed, which was about 10 or 12 miles per hour, at which time his truck and the Plymouth were about 15 or 20 feet apart; that from the time the Plymouth stopped until the collision it was standing still just "instantly" and that at the time of the collision the two automobiles had "just stopped," and that he did not see the "flash lights" go on when the Plymouth stopped; that there was nothing at all to obstruct his vision; that after his truck hit the Plymouth, the Plymouth hit the Essex, and that the Essex was knocked across the sidewalk and into the prairie and onto a floral sign which was about 30 feet north of the curb of Archer avenue.  Harold Flint, Jr., called by defendants, testified that on July 28, 1938, at about a quarter to eight in the morning he was driving a car northeast on Archer avenue at a speed of 35 or 40 miles per hour; that he did not notice anything in particular except that there was a steam roller going "east"; that he heard a crash and looked over, but did not pay any attention until the crash; that at the time of the crash he was in the intersection of Archer avenue and Mason avenue and the steam roller was a little bit east of where he was, the front end of the steam roller being opposite the middle of his car and about in the middle of the intersection.  Edward F. McCarthy, called by defendants, testified that he was a police officer, assigned to the accident prevention division, and that he visited the scene of the accident a short time after the occurrence; that he tested the

truck after the accident by driving it and that it stopped in 42 feet at 20 miles an hour; that such a truck with its braking equipment in good working order should have stopped in between 25 and 30 feet at 20 miles an hour; that the truck and its load weighed about 36,000 pounds; that the defendant Armey in a conversation with him (McCarthy) at the scene of the accident said he ''hadn't had much sleep,'' and that the floral sign is about 25 or 30 feet north of the curb of Archer avenue across the sidewalk and to the prairie.

It will be seen that there is competent evidence that the accident took place on a clear day and on a broad and well paved highway; that Armey was driving a loaded truck weighing about 36,000 pounds at a speed estimated at from 40 to 50 miles per hour; that he drove at such speed while his braking equipment was not in good working order; that he was 75 feet behind the Plymouth automobile when he saw the two automobiles slow down; that there was nothing at all to obstruct his vision; that he observed the car in front of the Plymouth as well as the steam roller, all of which were some distance in front of him; that he could stop his truck at the speed he was going at that time in about 35 or 40 feet; that the truck struck the rear part of the Plymouth which was then standing still 6 or 8 feet behind the Essex; that the impact pushed the Plymouth into the Essex; that the Essex was by the force of the impact, knocked across the parkway and the sidewalk and into the prairie and onto a floral sign about 30 feet north of the curb of Archer avenue and about 40 feet west of Mason avenue, and that the force of the impact knocked the Essex a distance of 60 or 70 feet from where it had stopped. The jury saw and heard the witnesses and looked at the photographs. We are of the opinion that there was competent evidence to warrant the jury in finding that Armey was guilty of wilful and wanton misconduct. We find that

the evidence on the question of wilful and wanton misconduct presented a question of fact for the jury, and that the verdict is not against the manifest weight of the evidence.

For the reasons stated, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.